Glenn F. **WEIBY**, Plaintiff,

v.

Herbert Gene **MARFELL**, Defendant,
and
**Farmers Mutual Automobile Insurance Company**, Garnishee.

Civ. A. No. 4637.

United States District Court
D. Minnesota,
Fourth Division.

Dec. 10, 1958.

M. W. Gaughan, of Freeman, Peterson, Hoppe & Gaughan, Minneapolis, Minn., for the plaintiff.

Ralph T. Lilly, St. Paul, Minn., and F. P. Bradford, of Thomas, Bradford, King & Collatz, St. Paul, Minn., for the garnishee.

NORDBYE, Chief Judge.

This cause came on for trial without a jury on a supplemental complaint filed by the plaintiff against the garnishee contending that the garnishee was indebted to the defendant, Herbert Gene Marfell, under the terms of a certain contract of liability insurance issued to him.

In May, 1953, Marfell, the defendant, and Weiby, the plaintiff in this action, were involved in an automobile accident. Shortly thereafter, Marfell, through his personal lawyer, obtained a settlement of his claim against Weiby, the driver of the other car. Apparently the settlement was effected with Weiby's insurance carrier. Marfell was insured with Farmers Mutual Automobile Insurance Company (hereinafter called Farmers or the Insurance Company). The coverage for

bodily injury liability was $10,000 for each person, $20,000 each accident, and $10,000 property damage liability for each accident. Farmers was properly notified of the accident and made an investigation in which Marfell evidently cooperated fully. The Insurance Company's file lay dormant from the summer of 1953 until Weiby's action was commenced against Marfell on or about July 1, 1955. In the meantime, Marfell had disappeared from the State and was not to be found herein. Plaintiff obtained service upon Marfell by serving the Commissioner of Insurance under Minnesota Statutes Annotated, Sec. 170.55, and mailing the necessary papers to Marfell's last known address, which happened to be the home of Marfell's parents. These papers, however, were returned unopened by Marfell's parents to plaintiff's attorneys, and were not accepted by them until a later date, at which time they forwarded the suit papers to Farmers. On August 4, 1955, Farmers received notice of the suit from plaintiff's attorneys, and on or about August 8, 1955, Farmers received the suit papers from Marfell's parents.

When Farmers received notice of the suit, it attempted to get in touch with Marfell through his parents on August 23, 1955, August 24, 1955, and again on September 20, 1955. In these investigations, Farmers' investigator was notified on one of these visits that Marfell had served time in the Oklahoma penitentiary and had returned to Minneapolis for a short visit with his parents during the summer of 1955. In addition to the investigation as to Marfell's whereabouts with his parents, the Insurance Company also checked at a former address of Marfell in Hopkins, Minnesota. These contacts failed to reveal the whereabouts of Marfell, but did disclose that he had been informed by his parents that a suit had been commenced against him growing out of the May, 1953, accident, and indicated that it would be quite impossible to locate Marfell inasmuch as he was a drifter and had left no indication where he was going when he left Minneapolis

some time in the summer of 1955. The Insurance Company interposed no answer to plaintiff's complaint. It requested no continuance and tendered no defense on his behalf. Plaintiff obtained a default judgment in February, 1956, against Marfell in the sum of $9,284.80, plus costs. The Insurance Company refused to pay this judgment and plaintiff brought this garnishment action. As a basis for its claim of no moneys due under its policy, Farmers raises the defense of lack of cooperation. The provisions of the policy which bear upon the cooperation question are as follows:

"Conditions:

"(2) Notice of claims or suit, Coverages A & B.

"If claim is made or suit is brought against the insured, the insured shall immediately forward to the company every demand, notice, summons, or other process received by him or his representative.

"(16) Assistance and cooperation of the insured.

"Coverages A, B, D, E, F, G, H & I.

"The insured shall cooperate with the company and upon the company's request shall attend hearings and trials and shall assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation, or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the accident."

It will be observed that there is an affirmative obligation on the part of the insured to cooperate with the company.

When the papers in this suit against Marfell were mailed on July 1, 1955, by plaintiff's attorneys to the last known address of Marfell and when the papers were returned by Marfell's parents with a notation "Not here", plaintiff's counsel on August 4, 1955, wrote the following letter to Mrs. Winifred Marfell, Mar-

fell's stepmother, who resided with Marfell's father at the insured's last known address.

"When we wrote your son, Herbert Gene Marfell, on June 6 enclosing certain papers dealing with a suit for damages arising out of Herbert's auto accident, May 21, 1953, we were merely complying with the Minnesota law providing for such process. We understand that you took the liberty of returning the letter and its contents to this office. By doing so you might be depriving Herbert of his insurance protection, and I suggest, instead, that you send the envelope and its contents, which we now enclose, to the Farmers Mutuals of Madison, Wisconsin, with local offices at 1114 Minnesota Building, 4th and Cedar Streets, St. Paul 1, Minnesota."

The record is not too clear as to the exact period when Marfell returned to Minneapolis from the Oklahoma penitentiary to his parents' home, but it does disclose that he was here after Peterson's letter arived. In answer to the question as to what time of the year 1955 he came home, his father answered in a deposition taken by the Insurance Company as follows:

"A. By Golly, I don't. I don't know. I just can't remember what date. I didn't pay no attention. It was in the summer, wasn't it, or was it? I don't know. In July, it must have been somewhere in July."

Then in response to the question,

"Q. Now when he was home the first time from Oklahoma, did you advise him of the fact that there was the suit pending against him?"

he replied,

"A. Well, I believe we did mention it. I don't know whether she [meaning his wife] mentioned it or me. I don't know where it was when we mentioned it, but there must have been something about it —we did mention something to Gene, and Gene says—

*   *   *   *   *   *

"Q. What did Gene say? A. Well, I think—I don't know who told him, you or me. There was something about some attorney or something had sent a letter addressed to him or something, and Gene said, 'I don't care about it. They can't do anything about it to me,' or something—something on that order. I can't remember this. This was too long ago, you know. I have got it as near as I can remember it. I can't say if that is the exact words. I can't say whether she told him or me. I think she must have mentioned it probably to him. If we knew anything about it, we must have told him when he was back, because naturally I would tell him if anything come up if he was home. I think though that we mentioned something about it, and I think Gene said, 'Well, I can't do nothing about it,' or something. 'Don't bother me,' or something—something on that order, I would say. Of course he was talking to me. Me and Gene don't have very much to say. Gene don't tell me any of his business; I don't tell him any of mine. We don't get along that good at all. Gene don't stay long enough living with me; won't settle down. He is his own boss. He is of age. I can't tell him what to do, see. He is on his own."

Later in the deposition of the father, he was asked:

"Q. Do you remember telling Gene that the insurance company was trying to contact him? A. Yes, I think we told Gene that. I think we told Gene that.

"Q. What did he say? A. Rather she told him that and I think he said he didn't care because the (sic) couldn't do nothing to him anyway, something on that order it was. I won't say, I mean say exactly the words what he repeated, but it was something on that order, because Gene was pretty sharp and quick

when he answered me you see. Of course, probably the reason it was was because he didn't understand what it was all about, I guess. He thought it was all settled whatever it was. I don't know. I couldn't tell you what he has got in his mind. He is not with me enough, you know."

In Mrs. Marfell's deposition, the following question was propounded to her:

"Q. Did you tell him that the insurance company was trying to contact him? A. I don't think we could have said about the insurance company. We probably said we had gotten letters from Peterson's office —probably what we said. I don't know if we could have said about the insurance company or not.

"Q. What did he say then in response to your telling him that Peterson's office was trying to contact him? A. Well, I couldn't say the exact words. Seems he would say—probably would have said, 'I don't care anything about it; what could you do about it; what could they do about it?' He told me something to that effect."

The deposition of Mrs. Marfell was taken on the 28th day of March, 1958, and in answer to the question, "You don't know where he is now?", she answered, "No, I couldn't say at all; might be in Mexico or California, might be in Alaska as far as we are concerned."

Moreover, it is to be gathered from the deposition of the insured's father that, although the insured was in Minneapolis in the summer of 1957, he made no attempt to get in touch with his Insurance Company, and in stating that the insured was here in the summer of 1957, the father in addition stated,

"A. We don't know whether he is in California now or rather he is in some place else. He could be any place, I would say, and he was even talking about joining the Foreign Legion. He might even be there for all I know."

It is fair to find from the entire deposition of Mr. and Mrs. Marfell that the insured was notified that certain papers had come to him at his parents' address regarding a suit for damages arising out of the automobile accident of May 21, 1953. In other words, it seems reasonably clear that the insured was notified of Mr. Peterson's letter of August 4, 1955, in which he notified Mrs. Marfell of the suit for damages arising out of the May, 1953, accident. Admittedly, there is a certain indefiniteness in the somewhat garrulous testimony of Mr. Marfell as to just what information was given to the insured, but sparse and indefinite as it may have been, it would seem that any reasonably prudent person under similar circumstances would either have gotten in touch with his Insurance Company or left a forwarding address with his parents as to where he might be located if he was needed by reason of the suit for damages arising out of the May, 1953, accident. That the insured failed to cooperate with his Insurance Company seems apparent. He vanished from the city some time prior to the period when the insurance investigator visited his parents' home in August and September, 1955. His travel habits were aptly described in his father's deposition when the latter stated,

"If he goes out to go somewhere— if he goes out and is going to hitchhike a ride, whichever guy comes along whichever direction, he will take. If a guy picks him up, it don't matter which way he goes. That is the best knowledge I can give you. I have seen it happen many times that way."

Plaintiff contends that the Insurance Company should have attempted to locate the insured by contacting the Armed Forces, his former employer, the Drivers License Bureau, the Motor Vehicle Department, the Armed Forces recruiting offices, the Veterans' Administration, the National Guard, the State Bonus Department, and the Parole Officer of the Oklahoma State Penitentiary. There is no showing here that Marfell was ever in

the Armed Forces, or that he had any relations with the Veterans' Administration, or that he was entitled to any bonus on account of service in the Armed Forces. Surely, there was no reason to assume that the Motor Vehicle or Drivers License Bureau of the State would have any knowledge as to his whereabouts in that he was not a resident of Minnesota. It is true that the insurance investigator was notified by the insured's parents that the insured had served a term in the Oklahoma penitentiary and was released in the summer of 1955. But there is no showing here that the insured was released on parole or that he was subject to any supervision by anyone connected with that institution; in fact, his wanderings about the country would indicate the contrary. There is not the slightest support for the assertion that inquiry at any one of the agencies referred to by the plaintiff would have disclosed the insured's whereabouts. It is evident that the Insurance Company was confronted with an insured who intentionally refused to cooperate in any way with his Insurance Company when he had sufficient information to advise him that a suit was pending against him by reason of the May, 1953, accident.

The Court is fully mindful that, as observed in Pennsylvania Threshermen & Farmer's Mutual Cas. Ins. Co. v. Owens, 4 Cir., 238 F.2d 549, 550,

"The problem of non-cooperation has a dual aspect; not only what the assured failed to do, but what the insurer on its part did to secure cooperation from an apathetic, inattentive, or vanished policy holder, must be considered. Liability insurance is intended not only to indemnify the assured, but also to protect members of the public who may be injured through negligence. Indeed, such insurance is made mandatory in many states. It would greatly weaken the practical usefulness of policies designed to afford public protection, if it were enough to show mere disappearance of the assured without full proof of proper efforts by the insurer to locate him."

However, notwithstanding the observations in the Pennsylvania Threshermen case, an insurer is entitled to the full cooperation of its insured. Preparing a defense without the insured's cooperation is well nigh impossible. Plaintiff points out that the Insurance Company did not make an appearance in the proceedings instituted by him, that it did not request additional time within which to answer, or ask the Court for a continuance. But to what avail would it have been to the Insurance Company to have entered an appearance for the insured with the implication of a waiver of non-cooperation? Nearly seven months elapsed from the time the summons was served until default judgment was entered in February, 1956. There is not the slightest showing that the most meticulous search for the insured between the time the summons was served, and when judgment was entered, would have furnished any clue to the insured's whereabouts. When the Insurance Company was informed by the only people who might have any knowledge of his whereabouts that after being apprised of a pending lawsuit against him, he departed to parts unknown, it is difficult to understand what more the Insurance Company could have done to locate him. The futility and bafflement of any search for a man who might be in any part of the United States or even perchance in some unknown region with the Foreign Legion seems apparent. It would have been to no purpose for the Insurance Company to enter an appearance and attempt to defend with claimed reservation of rights a lawsuit where the testimony of the defendant, the driver of the car, was indispensable. To appear in court without the driver of the car would have been tantamount to a confession of liability, particularly where the Insurance Company would have to admit that the insured had departed to parts unknown. The garnishee has fairly sustained the burden of proof that it exercised such care as a reason-

**402**

ably prudent person would have exercised under the circumstances in attempting to locate the insured.

 The cases dealing with the "lack of cooperation" defense are far from uniform. The case of Staples v. Southern Fire & Casualty Co., Ky., 1956, 289 S.W.2d 512, presents the extreme view in discarding the defense of lack of cooperation. However, as opposed to the attitude taken by the Kentucky court in the Staples case, supra, we find cases in which the insured's mere failure to leave a forwarding address has influenced the court in denying coverage. See Schoenfeld v. New Jersey Fidelity & Plate Glass Ins. Co., 1922, 203 App.Div. 796, 197 N.Y.S. 606; Hawkeye-Security Ins. Co. v. Myers, 7 Cir., 1954, 210 F.2d 890; Polito v. Galluzzo, 1958, 337 Mass. 360, 149 N.E.2d 375. Here we do not have an unsubstantial or immaterial failure to cooperate, but a lack of cooperation which left the Insurance Company helpless to defend. Under the facts, defendant could not have recovered against the Insurance Company. The rights of the plaintiff herein are no greater. Curran v. Connecticut Indemnity Co. of New Haven, 1941, 127 Conn. 692, 20 A.2d 87; Goldberg v. Preferred Accident Insurance Company, 1932, 279 Mass. 393, 181 N.E. 235; Eakle v. Hayes, 1936, 185 Wash. 520, 55 P.2d 1072; Century Indemnity Company v. Hartford Accident & Indemnity Company, Sup., 1951, 130 N.Y.S.2d 844; Cameron v. Berger, 1938, 336 Pa. 229, 7 A.2d 293; Tennant v. Farm Bureau Mutual Automobile Ins. Co., 1955, 286 App.Div. 117, 141 N.Y.S. 2d 449; Zitnik v. Burik, 1946, 395 Ill. 182, 69 N.E.2d 888.

 The Court has weighed the factors in favor of public protection and the rights of an insurance company under a policy which requires the cooperation of the insured, and concludes that under all the facts and circumstances disclosed herein, the Insurance Company was left without any aid from the insured to defend properly against a claim made under its policy and that it has sustained the burden of proof that there

was an obvious and intentional failure on the part of the insured to comply with the obligations therein with reference to reasonable cooperation. It follows that the garnishee is entitled to a finding that its coverage under the policy has been negated by the insured's willful breach of its conditions.

The above may be considered as the Court's findings of fact, and as conclusions of law the Court finds that the garnishee is not indebted to the defendant herein and that it should be discharged as such garnishee with costs. It is so ordered. Let judgment be entered accordingly. An exception is reserved.